UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TYLER PUGEDA,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>Defendant. | Civil Action No. 26-14932<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

Plaintiff Tyler Pugeda ("Plaintiff" or "Mr. Pugeda"), by and through his undersigned counsel, brings this action against Defendant President and Fellows of Harvard College ("Harvard"), which owns and operates Harvard University and Harvard Medical School ("HMS"), and alleges as follows:

## INTRODUCTION

1. This is an action for disability discrimination arising out of Harvard's treatment of a qualified Deaf applicant to Harvard Medical School. Plaintiff brings this action under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), the Massachusetts Equal Rights Act, Mass. Gen. Laws ch. 93, § 103 (the "MERA"), and the Massachusetts public accommodation statute, Mass. Gen. Laws ch. 272, § 98.

2. Mr. Pugeda is a Deaf scientist who communicates primarily in American Sign Language ("ASL"). He trained at Johns Hopkins and the Rochester Institute of Technology and conducted neuroscience research at the University of Rochester School of Medicine and Dentistry. He won a Fulbright research fellowship to study neurodegenerative disease in Germany and

worked as a research technician at Massachusetts General Hospital, an HMS teaching hospital. In May 2023, at HMS's invitation, he addressed its Diversity Council on Deaf inclusion and accessibility. In September 2023 he completed his application to HMS. The David Geffen School of Medicine at UCLA admitted him the day before his HMS interview and later awarded him a full-tuition scholarship. The Carle Illinois College of Medicine also admitted him and offered him a scholarship covering 75 percent of his tuition. HMS rejected him.

3. Mr. Pugeda's application disclosed that he is Deaf and uses ASL. On October 30, 2023, HMS invited him to interview, and that same day he requested ASL interpreters for the interview. On November 14, 2023, HMS told him in writing that it would not provide interpreters for one-on-one conversations with its Admissions Ambassadors, the current students it offered to interviewing applicants as resources. On December 1, 2023, Dr. Robert J. Mayer, HMS's Faculty Associate Dean for Admissions ("Dean Mayer"), who chaired its Committee on Admissions, its Pathways main committee, and its executive committee, interviewed him and asked him, in substance, why, as a Deaf person, he had not chosen to research hearing loss. Near the end of that interview, Dean Mayer advised him to have open and honest conversations with current HMS students.

4. On March 1, 2024, HMS rejected him in a form letter issued in Dean Mayer's name that identified no deficiency in his application. When Mr. Pugeda later raised his concerns, Dr. Fidencio Saldaña, HMS's Dean for Students, who sat on HMS's admissions executive committee and its Pathways main committee, wrote that he was "unable to share details about the HMS admission process in general or [Mr. Pugeda's] specific application," and that Mr. Pugeda's interview "did not alter the outcome of [his] application." The official who asked a Deaf scientist why he had not chosen to research hearing loss chaired the committees that scored and voted on

Pathways applicants, and the rejection issued in his name. Plaintiff alleges on information and belief, based on the facts alleged below, that HMS rejected him because he is Deaf.

5. Mr. Pugeda seeks compensatory and consequential damages, exemplary and punitive damages under state law, nominal damages, and reasonable attorneys' fees and costs.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 because they arise under the laws of the United States, namely Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

7. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy as Plaintiff's federal claims and share a common nucleus of operative fact. This Court also has original jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1332(a)(1), because Plaintiff is a citizen of California, Defendant is a Massachusetts corporation with its principal place of business in Massachusetts, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant resides in this District and a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

9. Plaintiff Tyler Pugeda is Deaf. He communicates primarily in ASL and uses ASL interpreters in clinical settings, including on hospital wards, and wherever precise real-time spoken communication matters, such as interviews. He uses cochlear implants, which provide partial auditory input and do not make interpretation unnecessary in those settings. Throughout the HMS

application process, from his application in 2023 through his rejection in 2024, he lived and worked in Boston, Massachusetts, as a research technician at Massachusetts General Hospital. He is from Orange County, California, where his parents live, and his driver's license lists their Orange County address. In August 2024 he returned to California to attend the David Geffen School of Medicine at UCLA, and he now lives in Los Angeles, California. At all relevant times, Mr. Pugeda has been an otherwise qualified individual with a disability within the meaning of Section 504, a person with a handicap as defined in Mass. Gen. Laws ch. 151B, § 1(17), which the MERA incorporates, and an otherwise qualified handicapped individual within the meaning of Article 114 of the Amendments to the Massachusetts Constitution ("Article 114"). He has a physical impairment, a hearing impairment, that substantially limits one or more major life activities, including hearing and communication; he has a record of such an impairment; and Harvard regarded him as having one.

10. Defendant President and Fellows of Harvard College is a Massachusetts nonprofit educational corporation with its principal place of business in Cambridge, Massachusetts. Harvard owns and operates Harvard University and its constituent faculties, including Harvard Medical School, located at 25 Shattuck Street, Boston, Massachusetts. At all relevant times, Harvard received federal financial assistance, including research grants and student financial aid, and under 29 U.S.C. § 794(b)(2)(A), the term "program or activity" includes all of the operations of a college or university any part of which receives such assistance. Harvard was therefore, at all relevant times, a recipient subject to Section 504 and its implementing regulations in all of its operations, including HMS admissions. Harvard is also a "person" within the meaning of Mass. Gen. Laws ch. 93, § 103, and conducts business and education within the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### A. HMS Refused to Interpret Applicants' Conversations with Its Admissions Ambassadors.

11. During the 2023-2024 admissions cycle, HMS invited interviewing applicants to connect individually with Admissions Ambassadors, who were current HMS students. HMS published an Admissions Ambassador Directory on its applicant portal, told applicants the directory "is comprised of students who wish to be resources to our interviewing students," invited applicants to "reach out to them directly," and offered, through a survey form, to "facilitate your connection" with students who had not published an email address or who shared an applicant's professional or personal interests. HMS told applicants that the Ambassadors "will be a great resource for you to learn more about what the academics, culture, and community at HMS are like."

12. HMS ran the Admissions Ambassador program through its Admissions Office, which signs its correspondence with applicants as the "Office of the Committee on Admissions." That office matched applicants with Ambassadors on request and published the Ambassador directory on the applicant portal, a Canvas site HMS maintained for interviewing applicants. Dean Mayer's own welcome page on that site, signed as Faculty Associate Dean for Admissions and Chairman of the Committee on Admissions, told interviewing applicants that "[m]embers of the Committee on Admissions, faculty, staff and current students are all looking forward to meeting you."

13. Nothing HMS published to applicants limited the format in which an applicant and an Ambassador could communicate, and HMS's own November 14, 2023 email, quoted below, refers to "additional social activities with Admissions Ambassadors" beyond the sessions on the interview-day schedule. HMS described its Ambassadors as current students "interested and

excited to get to know our interviewees," and closed its Ambassador page: "Our students look forward to meeting you!" The Ambassador biographies posted on the same page described what the Ambassadors "would be willing to talk with interviewing students about." Plaintiff alleges on information and belief, based on that email, on those statements, on the absence of any published format restriction, on HMS's offer to facilitate connections, and on the in-person meetings with two HMS students that Mr. Pugeda arranged in 2020 and that HMS staff included, with interpreters, in the visit schedule they proposed for him, described in paragraph 15, that applicants who did not require interpreters were free to meet Ambassadors by video or in person as well as by email.

14. On November 10, 2023, Mr. Pugeda wrote to the HMS Admissions Office that he had identified five Ambassadors he could potentially contact. Email was his preferred channel, he wrote, but "if any of these individuals prefer to have face-to-face communication (online), I will promptly notify you and discuss the necessary arrangements." Without an interpreter, a live conversation with a hearing Ambassador who did not sign risked misunderstanding on both sides; email was the channel he could rely on without one. On November 14, 2023, Danika Wagner answered for the office: "We are happy to hear that you have found students to reach out to via our Admissions Ambassador directory. However, as a reminder, the Admissions Office can only provide interpreter services for official interview sessions. Any additional social activities with Admissions Ambassadors, outside of the sessions with students listed on the Pathways interview day schedule (i.e. meet and greet, Student Council Fireside Chat, etc.), are not sponsored by our office."

15. HMS gave that answer to an applicant it knew to be Deaf and to require ASL interpretation. The answer was categorical, and the label "not sponsored by our office" did not

change what HMS offered: the office that wrote it was the office that published the Ambassador directory, matched applicants with Ambassadors on request, and told applicants that its students "look forward to meeting you!" HMS would interpret the group sessions with students listed on its interview-day schedule, but it would not interpret a one-on-one conversation with any Ambassador, whatever the Ambassador, the subject, or the format. HMS had the means to do so. In the same email, it told Mr. Pugeda that, for the scheduled sessions, if the interpreters he had identified were unavailable, it would "coordinate with the HMS Office of Disability Services and utilize interpreter services that we have on contract." Eleven days earlier, the same office had told him that, once his interview date was set, it would send him a list of the optional sessions he was invited to attend, and that it could then "work with you [to] make sure interpreters are available for any additional sessions that you would like to join." HMS had previously offered to arrange interpreters for Mr. Pugeda's own conversations with its students. In planning Mr. Pugeda's March 12, 2020 visit to HMS as a prospective applicant, the Director of Administration of HMS's Harvard/MIT M.D.-Ph.D. Program proposed a schedule that included meetings with HMS faculty and with two HMS students he knew, wrote that she would "coordinate the faculty appointments and the interpreters," and added, "I'm assuming you need the interpreter for your meetings with [the students], too." In 2023, HMS offered no way to obtain an interpreted one-on-one conversation with an Ambassador. Because HMS had told him, before any conversation was arranged, that it would interpret none of them, Mr. Pugeda did not ask any Ambassador for a live conversation. A request would have been futile; HMS had already answered it. He corresponded with Ambassadors only by email. Once he began, he found it hard to keep putting his questions in writing and would have preferred to meet them live, so he limited that correspondence to two

Ambassadors, to whom he first wrote on November 20, 2023, six days after HMS's refusal. Had HMS agreed to interpret, he would have sought live, interpreted conversations with Ambassadors.

16. Seventeen days after that refusal, near the end of the December 1, 2023 interview, Dean Mayer advised Mr. Pugeda to have open and honest conversations with current HMS students and, as Mr. Pugeda recalls it, used the word "gospel" to describe how he should treat what they told him. Mr. Pugeda understood Dean Mayer to be describing individual conversations, not group sessions or email. HMS did not withdraw its refusal to interpret one-on-one conversations with Ambassadors.

**B. Mr. Pugeda Is a Qualified Deaf Scientist.**

17. Mr. Pugeda has been Deaf throughout the events relevant to this Complaint.

18. Mr. Pugeda earned a bachelor's degree in mathematics and philosophy from California State University, Northridge. He completed the Post-Baccalaureate Premedical Program at Johns Hopkins University, where he prompted the expansion of closed-captioning access for students, delivered a TEDx talk, and published a first-authored article on sleep medicine. He earned a Master of Science degree at the Rochester Institute of Technology ("RIT"), home to the National Technical Institute for the Deaf, where he was selected for the Rochester Bridges to the Doctorate program for Deaf and hard-of-hearing scholars in the biomedical sciences. He conducted biochemistry research at RIT and neuroscience research at the University of Rochester School of Medicine and Dentistry; a co-authored meeting report arising from the University of Rochester research was published online in November 2022. He was awarded a Fulbright research fellowship, under which he conducted research in Germany on Alzheimer's disease. In October 2022, a laboratory in HMS's Department of Neurobiology offered him a research assistant

position. He later worked as a research technician in heart preservation research at Massachusetts General Hospital, an HMS teaching hospital.

19. In March 2023, HMS's Office for Diversity Inclusion and Community Partnership invited Mr. Pugeda to speak on disability access to the HMS Diversity Council. On May 9, 2023, he presented to the Council on the need for a comprehensive system for Deaf inclusion at HMS and its affiliates. He described that invitation in the supplemental essays he submitted with his HMS application. At the same May 9, 2023 meeting, the Council's co-chair presented on "Accommodating Deaf and Hard of Hearing (DHoH) Professionals" and closed "by listing the benefits of training Deaf and Hard-of-Hearing doctors," and the Director of HMS's Office of Disability Services told the Council that his office "has worked with students with sensory impairments."

20. On September 6, 2023, Mr. Pugeda submitted his HMS supplemental application for the entering class of 2024, including for the Pathways M.D. program. His application disclosed that he is Deaf and uses ASL. He identified his deafness, his cochlear implants, and his use of sign language in his AMCAS application; he described his deafness, his use of ASL, and his "deaf accent" in his HMS supplemental essays; and he described his use of an ASL interpreter. Plaintiff alleges on information and belief that the letters of recommendation HMS received identified him as Deaf, and that one of them, from his research mentor at RIT, stated that he "communicates mostly through American Sign Language." The basis for that allegation is the text of that passage of the letter, which its author has provided to Mr. Pugeda, and the letter inventory he submitted to the Johns Hopkins Post-Baccalaureate Premedical Program, which designated those letters for both its M.D. and M.D.-Ph.D. letter packets. His application also identified two publications.

21. On October 30, 2023, HMS invited Mr. Pugeda to interview for the Pathways M.D. program. HMS had his transcripts, test scores, publications, and letters of recommendation when it did so, and it assigned two members of its admissions committees to interview him. Plaintiff alleges on information and belief, based on that invitation and on that assignment, that HMS had determined that his academic and professional record met its standards for admission.

22. On November 30, 2023, one day before his HMS interview, Mr. Pugeda was admitted to the David Geffen School of Medicine at UCLA. In January 2024, the Carle Illinois College of Medicine at the University of Illinois Urbana-Champaign also admitted him, and on February 28, 2024 it offered him a scholarship covering 75 percent of his tuition. Both schools admitted him before HMS rejected him. He matriculated at UCLA on August 12, 2024 as a recipient of the Leaders of Tomorrow Scholarship, which pays his full tuition and is renewable annually through all four years of medical school, and he remains enrolled there.

23. Mr. Pugeda meets the academic and technical standards requisite to admission to HMS, with or without reasonable accommodation, and is therefore a qualified handicapped person within the meaning of 34 C.F.R. § 104.3(l)(3). Deaf and hard-of-hearing physicians practice medicine throughout the United States, including at leading academic medical centers, and have practiced at hospitals affiliated with HMS, with appropriate auxiliary aids and services. ASL interpreters and other standard auxiliary aids and services are routinely available and constitute reasonable accommodations within the meaning of Section 504 and the MERA.

### C. Mr. Pugeda Requested ASL Interpreters.

24. On October 30, 2023, the same day he received the interview invitation, Mr. Pugeda submitted a request to the HMS Admissions Office for ASL interpreters as an accommodation for his admissions interview.

25. On October 31, 2023, having learned that the HMS Admissions Office used more than one email address, Mr. Pugeda resent the request to both addresses, noting that he was resending it to ensure it reached the correct address. The Admissions Office responded later that same day that it was "currently working to ensure that accommodations are in place" for his interview.

**D. The Interview.**

26. The Admissions Office assigned two interviewers. The first was Dean Mayer, who also chaired the HMS Committee on Admissions, its Pathways main committee, and its executive committee, which has final authority for admitting students. The second was Dr. David Kieff, an otolaryngologist (an ear, nose, and throat physician) on the HMS faculty. HMS lists Dr. Kieff as a member of Pathways Subcommittee I of its Committee on Admissions.

27. On December 1, 2023, Mr. Pugeda was interviewed by Zoom. Dean Mayer and Dr. Kieff conducted the interview in separate sessions. ASL interpreters Rachel Judelson and Nathan Fowler were present to facilitate communication.

28. Mr. Pugeda recalls that Dean Mayer questioned his educational choices with skepticism, asking in substance why, after doing well at Johns Hopkins, he had enrolled at RIT, and characterizing that choice as random. RIT is home to the National Technical Institute for the Deaf, a federally funded institution serving Deaf and hard-of-hearing students. Mr. Pugeda chose RIT for its Rochester Bridges to the Doctorate program and its community of Deaf scientists and healthcare professionals, and he explained that choice in response to the question.

29. Dean Mayer then asked Mr. Pugeda, in substance, why, as a Deaf person, he had not chosen to do research on hearing loss. Mr. Pugeda recalls that the question followed on his explanation of why he had chosen RIT, and that Dean Mayer prefaced it with words to the effect that people with experience often research their own experience.

30. The research Mr. Pugeda had pursued included the neurodegenerative-disease research for which he had been awarded a Fulbright fellowship. The question assumed that a Deaf applicant should study deafness. Nothing in that premise bears on fitness for medical school.

31. During the interview, Mr. Pugeda told Dean Mayer, among other things, that he is proud to be Deaf.

32. Mr. Pugeda also recalls Dean Mayer questioning him about a perceived absence of research publications. His application identified two publications: a first-authored article on sleep medicine written at Johns Hopkins, and a co-authored meeting report in the *International Journal of Radiation Biology* arising from his work at the University of Rochester.

33. Mr. Pugeda recalls that Dr. Kieff's portion of the interview proceeded differently. It was conversational; Dr. Kieff asked how ASL interpretation worked but did not ask why, as a Deaf person, Mr. Pugeda had chosen his research or his schools; and at its close Dr. Kieff told him, in substance, "we really favor you."

**E. The Rejection.**

34. On March 1, 2024, HMS's Director of Admissions emailed Mr. Pugeda a form rejection letter issued in Dean Mayer's name. The letter counted him among "so many students like you with excellent intellectual and personal qualities," identified no deficiency in his application, and gave as its only reason that HMS had more qualified candidates than it could admit.

35. Mr. Pugeda described Dean Mayer's hearing-loss question in writing to his research supervisor and to his pre-medical advisors on the afternoon of December 1, 2023, three months before HMS rejected him. He did not raise it with HMS while his application was pending, because Dean Mayer had influence over the Admissions Office and the Committee on Admissions, and he

feared that a complaint would make him appear confrontational and hurt his chances. On March 8, 2024, Mr. Pugeda raised his concerns with Dr. Fidencio Saldaña, HMS Dean for Students. HMS's 2023-2024 roster of its admissions committees lists Dr. Saldaña as a member of both the executive committee, which has final authority for admitting students, and the Pathways main committee. On March 13, 2024, Dr. Saldaña told Mr. Pugeda that he would look into the matter. After Mr. Pugeda asked for updates, Dr. Saldaña wrote that he was still looking into it. On May 15, 2024, Dr. Saldaña wrote that he had "had the opportunity to look into your interview experience" and that he was "unable to share details about the HMS admission process in general or your specific application." He continued: "I can confirm that your interview experience was consistent with what other candidates experienced; though, it was personalized in the same way that we do for all interviews – i.e., we ensure that the interview reflects an individual's application materials. I can further confirm that your interview did not alter the outcome of your application; though, that is the extent of what I am able to offer." Harvard has not disclosed to Mr. Pugeda who reviewed his application, at what stage it was decided, or on what basis.

36. HMS's 2023-2024 description of its admissions committees states that subcommittees "make an initial determination regarding applicant records," that each main committee "reviews and scores all forwarded candidates," and that the executive committee "votes on the final list of accepted applicants and wait-listed applicants." Dean Mayer chaired the Pathways main committee and the executive committee and was one of Mr. Pugeda's two interviewers. Plaintiff alleges on information and belief, based on that structure and that assignment, that Dean Mayer's evaluation of Mr. Pugeda was before the committee that decided his application, and that if the application reached the Pathways main committee or the executive committee, Dean Mayer scored or voted on it. Dr. Saldaña did not say when, by whom, or on what basis HMS reached the outcome he

described. In the alternative, if, as he wrote, the interview did not alter that outcome, then HMS decided the application on the written file, which disclosed that Mr. Pugeda is Deaf and uses ASL, through committees that Dean Mayer chaired, whose faculty members he vetted, or whose members he joined in selecting. Which committee decided the application, who took part, and on what basis are facts within Harvard's knowledge, and Harvard has not disclosed them to Mr. Pugeda.

37. The same HMS description states that nominees for its faculty subcommittees "are vetted by the faculty associate dean for admissions (FADA), and a list of proposed candidates is submitted to the Faculty Council for formal approval"; that main committee members "are selected from the subcommittees by the FADA, the subcommittee chairs, and the director of admissions"; that "[t]he FADA sits on both main committees (Pathways and HST), and chairs the Pathways main committee"; that the executive committee "is composed of the FADA, who serves as chair, four subcommittee chairs, chair of the HST main committee, and the dean for students"; and that committee service "may be extended at the discretion of the FADA." In the 2023-2024 cycle, the FADA was Dean Mayer.

38. HMS states in its published admissions selection factors that "[a]pplicants with disabilities will be evaluated on a case by case basis in accordance with technical standard guidelines as suggested by the Association of American Medical Colleges," and that "[a]ll students must possess the physical and emotional capabilities required to independently undertake the full curriculum." Those statements appeared on HMS's admissions website throughout Mr. Pugeda's application: archived copies of the page dated June 7, 2023, before he applied, and February 9, 2024, before HMS rejected him, contain them, as did the page on March 14, 2024, and they appear there today. The technical standards the page refers to were approved by HMS's Educational

Policy and Curriculum Committee on December 13, 2021, and were published on the same website in June 2023 and February 2024. They describe themselves as "pre-requisites for entrance," define "candidates" to include "individuals who are seeking admission to the MD program," and state that candidates "should be able to perform the requisite skills in a reasonably independent manner" and "must be able to communicate effectively and efficiently with patients, their families, health care personnel, colleagues, faculty, staff and all other individuals with whom they come in contact." Plaintiff alleges on information and belief, based on those statements and on the disclosures in his application, that HMS's admissions committees evaluated Mr. Pugeda as an applicant with a disability, measured his deafness and his use of ASL interpreters against those standards, and weighed them in deciding his application.

39. Mr. Pugeda had disclosed his deafness in his application. Dean Mayer, HMS's Faculty Associate Dean for Admissions, chaired the Committee on Admissions, interviewed Mr. Pugeda, and was the official in whose name the rejection letter issued. Plaintiff alleges on information and belief that Mr. Pugeda's deafness was the reason HMS rejected him. The basis for that allegation is the hearing-loss question and who asked it; Dean Mayer's role in the process that decided the application; HMS's written refusal to interpret Ambassador conversations; HMS's policy of evaluating applicants with disabilities against its technical standards; the rejection, without any stated deficiency, of a record HMS had found strong enough to interview and that two other medical schools admitted; and Harvard's failure to tell Mr. Pugeda who decided the application or on what basis.

**F. Injury.**

40. Mr. Pugeda lost the opportunity to compete for admission to HMS on equal terms, and with it the education, training, mentorship, professional network, and career opportunities that

admission to HMS would have afforded. He also suffered emotional distress, humiliation, and loss of dignity. In the hours after the Mayer interview he had mild difficulty breathing, his heart raced, and he could not keep his thoughts in order. That day and over the days that followed, he recounted the interview to his interpreters, his research supervisor at Massachusetts General Hospital, his pre-medical advisors, his mother, and friends. From December 2023 until the rejection on March 1, 2024, he dwelled on the interview daily and found it harder to engage in his research work. The distress continued after the rejection and through his first two years of medical school. Each of these injuries is a direct and proximate result of Harvard's conduct. The emotional-distress and dignitary harms alleged in this paragraph are sought under Counts III and IV, and are not sought under Plaintiff's Section 504 claims.

## COUNT I

## Denial of Equal and Effective Access to Admissions Activities in Violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

41. Plaintiff repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

42. Harvard is a recipient of federal financial assistance within the meaning of Section 504, and its admissions operations are part of its "program or activity" under 29 U.S.C. § 794(b)(2)(A).

43. Section 504's implementing regulations prohibit a recipient, in providing any aid, benefit, or service, from doing any of the following on the basis of handicap: denying a qualified handicapped person the opportunity to participate in or benefit from it; affording an opportunity that "is not equal to that afforded others"; providing an aid, benefit, or service "that is not as effective as that provided to others"; providing different or separate services unless necessary to

make them as effective; and "[o]therwise limit[ing] a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 34 C.F.R. § 104.4(b)(1)(i)–(iv), (vii).

44. To be equally effective, aids, benefits, and services need not produce an identical result, but they "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 34 C.F.R. § 104.4(b)(2).

45. These obligations run to any "qualified handicapped person," a term the regulations define for postsecondary education by reference to the standards "requisite to admission or participation." 34 C.F.R. § 104.3(l)(3). They therefore reach applicants for admission, as does the separate prohibition on discrimination "in admission or recruitment." 34 C.F.R. § 104.42(a). A recipient may not deny or limit those opportunities "directly or through contractual, licensing, or other arrangements." 34 C.F.R. § 104.4(b)(1).

46. Department of Justice regulations coordinating the implementation of Section 504 also provide that recipients "shall take appropriate steps to ensure that communications with their applicants . . . are available to persons with impaired vision and hearing." 28 C.F.R. § 41.51(e).

47. ASL interpreters were necessary to afford Mr. Pugeda, a Deaf applicant who communicates primarily in ASL, an equal opportunity to participate in the admissions activities described above.

48. Harvard's categorical refusal to interpret one-on-one Admissions Ambassador conversations, made in writing to a known Deaf applicant in answer to his notice, denied Mr. Pugeda an option that, as alleged in paragraph 13, HMS made available to every interviewing applicant who did not need an interpreter: to seek out and hold a live, one-on-one conversation

with a current student through the Ambassador program. Mr. Pugeda could reach Ambassadors individually only in writing. He was not required to ask for what HMS had already refused in writing. Harvard provided that activity directly, through its Admissions Office, and through its arrangements with the students who served as Ambassadors, as part of its recruitment of the applicants it interviewed. Harvard thereby afforded him an opportunity to participate in that admissions activity that was not equal to the opportunity afforded others, and an aid, benefit, or service that was not as effective as that provided to others. 34 C.F.R. § 104.4(b)(1)(ii), (iii).

49. Harvard's refusal was not an oversight. It was a written statement of policy, issued by the Admissions Office in answer to Mr. Pugeda's notice, to an applicant for whom that same office was then arranging ASL interpreters and whom it therefore knew could not take part in a live conversation on equal terms without one. HMS knew its obligations: its Technical Standards, approved December 13, 2021 and published on its admissions website by June 2023, stated that HMS "will provide reasonable accommodations to those who qualify for them in accordance with its obligations under . . . Section 504 of the Rehabilitation Act of 1973." Harvard thereby intentionally excluded Mr. Pugeda from an activity of its admissions program, and denied him its benefits, solely by reason of his disability. In the alternative, Harvard acted with deliberate indifference to Mr. Pugeda's federally protected right to equal access: by November 14, 2023 the Admissions Office, acting through Danika Wagner, the staff member who was coordinating Mr. Pugeda's interpreters and who wrote the refusal, had the authority to provide interpreters and had interpreter services on contract; it knew that Mr. Pugeda was Deaf, that he required ASL interpretation for effective real-time conversation, and that Ambassador conversations were offered to every interviewing applicant; and it nonetheless adopted and applied a rule that denied him interpreted access to them and offered him no alternative.

50. As a direct and proximate result of Harvard's violation of Section 504, Mr. Pugeda was denied equal access to an admissions activity that HMS offered to every interviewing applicant. He is entitled to nominal damages, and to compensatory damages for any non-emotional injury proven at trial, pursuant to 29 U.S.C. § 794a(a)(2), and to a reasonable attorney's fee as part of the costs pursuant to 29 U.S.C. § 794a(b).

**COUNT II**

**Discrimination in Admissions in Violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794)**

51. Plaintiff repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

52. Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

53. The Department of Education's implementing regulations define a "qualified handicapped person," with respect to postsecondary education services, as one "who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity." 34 C.F.R. § 104.3(l)(3). The regulations prohibit a recipient from denying admission to, or discriminating in admission or recruitment against, a qualified handicapped person, 34 C.F.R. § 104.42(a), from using criteria or methods of administration that have the effect of subjecting qualified handicapped persons to discrimination, 34 C.F.R. § 104.4(b)(4), and from making use of "any test or criterion for admission that has a disproportionate,

adverse effect on handicapped persons" unless it "has been validated as a predictor of success" in the program and "alternate tests or criteria that have a less disproportionate, adverse effect are not shown by the Assistant Secretary to be available," 34 C.F.R. § 104.42(b)(2).

54. Mr. Pugeda is an otherwise qualified individual with a disability who meets the academic and technical standards requisite to admission to HMS, with or without reasonable accommodation.

55. Harvard discriminated against Mr. Pugeda in its admissions process, as set out above, by rejecting him through a process led by the administrator who asked him, in his admissions interview, why, as a Deaf person, he had not chosen to research hearing loss; by weighing his deafness in deciding his application, as alleged on information and belief above; by measuring him, as an applicant with a disability, against selection factors that require students to "possess the physical and emotional capabilities required to independently undertake the full curriculum" and technical standards stating that candidates, including applicants, "should be able to perform the requisite skills in a reasonably independent manner," criteria that bear more heavily on Deaf applicants, who communicate through interpreters, than on applicants who hear, and that, on information and belief, HMS has not validated as predictors of success in its program, HMS having described them as guidelines "suggested by" the Association of American Medical Colleges; and by denying him interpreted access to one-on-one Ambassador conversations available to other applicants.

56. Harvard thereby subjected Mr. Pugeda to discrimination under its admissions program and activity solely by reason of his disability. As alleged on information and belief in paragraphs 39 and 59, Harvard also excluded him from participation in that program, and denied him its benefits, when it rejected him solely by reason of his disability.

57. Dean Mayer chaired the Committee on Admissions, its Pathways main committee, and the executive committee with final authority over admission; he vetted the faculty nominated to its subcommittees and joined in selecting the members of its main committees; and the rejection issued in his name. His questioning of Mr. Pugeda shows the premise he brought to the evaluation of a Deaf applicant: that a Deaf scientist's research should concern deafness. Whenever HMS settled the outcome of Mr. Pugeda's application, it settled it through a process Dean Mayer led.

58. Harvard's discrimination was intentional. The hearing-loss question rested on an assumption about what a Deaf scientist ought to do, and the official who asked it led the process that rejected him. HMS's published policy, as alleged in paragraph 38, called for its committees to evaluate him as an applicant with a disability against standards that expect candidates to perform "in a reasonably independent manner."

59. HMS identified no deficiency in an academic and professional record that, as alleged above, it had judged sufficient to warrant an interview, and it has not disclosed how or by whom the application was decided. Dean Mayer's criticisms of Mr. Pugeda's choice of RIT and of a supposed absence of publications identified no deficiency: Mr. Pugeda had chosen RIT for its Bridges to the Doctorate program and its community of Deaf scientists, as alleged in paragraph 28, and his application listed two publications. Plaintiff alleges on information and belief, on the basis stated in paragraph 39, that Mr. Pugeda's deafness was the sole reason for the rejection.

60. The facts alleged support a reasonable inference that the reason Harvard gave was pretextual and that the actual reason for Mr. Pugeda's rejection was his deafness.

61. As a direct and proximate result of Harvard's violation of Section 504, Mr. Pugeda has suffered the non-emotional injuries set forth above, including the loss of the opportunity to compete for admission on equal terms, and is entitled to compensatory damages and to nominal

damages pursuant to 29 U.S.C. § 794a(a)(2), and to a reasonable attorney's fee as part of the costs pursuant to 29 U.S.C. § 794a(b).

## COUNT III

### Handicap Discrimination in Violation of the Massachusetts Equal Rights Act (Mass. Gen. Laws ch. 93, § 103, Enforcing Mass. Const. amend. art. CXIV)

62. Plaintiff repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

63. The MERA provides that any person within the Commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-one B, shall, with reasonable accommodation, have the same rights as other persons "to make and enforce contracts" and "to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution." Mass. Gen. Laws ch. 93, § 103(a). Plaintiff asserts each of those rights independently.

64. Article 114 provides: "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth." Mass. Const. amend. art. CXIV. The MERA makes that right enforceable by civil action. Mass. Gen. Laws ch. 93, § 103(b).

65. A violation of Mass. Gen. Laws ch. 93, § 103(a) "shall be established if, based upon the totality of circumstances, it is shown that any individual is denied any of the rights protected by subsection (a)." Mass. Gen. Laws ch. 93, § 103(c).

66. Mr. Pugeda is a person with a handicap as that term is defined in Mass. Gen. Laws ch. 151B, § 1(17), and is an otherwise qualified handicapped individual within the meaning of Article 114, with or without reasonable accommodation.

67. The HMS admissions process is a program or activity within the Commonwealth of Massachusetts within the meaning of Article 114.

68. Harvard denied Mr. Pugeda rights secured by Mass. Gen. Laws ch. 93, § 103(a), including the rights secured under Article 114, by each of the following acts, each of which is independently actionable and each of which occurred while Mr. Pugeda was seeking to form a contract for educational services with Harvard:

(a) On November 14, 2023, Harvard refused in writing, to an applicant it knew to be Deaf and in answer to his notice, to provide interpreters for any one-on-one conversation with an Admissions Ambassador, and thereby denied him, solely by reason of his handicap and without the reasonable accommodation Mass. Gen. Laws ch. 93, § 103(a) requires, the benefit of an admissions activity that, as alleged in paragraph 13, was available to every applicant who did not need an interpreter;

(b) Dean Mayer asked Mr. Pugeda, in his admissions interview, why, as a Deaf person, he had not chosen to research hearing loss, subjecting him to discrimination in the admissions interview solely by reason of his handicap; and

(c) As alleged on information and belief in paragraphs 39 and 59, Harvard rejected Mr. Pugeda's application solely by reason of his handicap.

69. Harvard's conduct was purposeful. The refusal described in subparagraph (a) was categorical, written, and given in answer to Mr. Pugeda's notice. The hearing-loss question, HMS's published policy of evaluating applicants with disabilities against standards that expect

independent performance, and the facts alleged in paragraphs 34 and 59–60 concerning the reason Harvard gave for the rejection show the same purpose.

70. Admission to HMS is the formation of a contract for educational services. HMS advertises its M.D. program to the public, invites applications from any member of the public who meets its published criteria, and, on admission, agrees to provide instruction in exchange for tuition. Harvard refused to make that contract with Mr. Pugeda on the terms it offered applicants who are not Deaf, and, as alleged on information and belief in paragraphs 39 and 59, it refused because of his handicap. The Admissions Ambassador program and the admissions interview are steps in Harvard's decision whether to make that contract, and Harvard's discrimination in those steps, alleged in subparagraphs (a) and (b) of paragraph 68, denied Mr. Pugeda the terms on which Harvard dealt with applicants who are not Deaf and interfered with his right to make that contract on the same terms as other applicants. Harvard thereby denied him "the same rights as other persons to make . . . contracts." Mass. Gen. Laws ch. 93, § 103(a).

71. The circumstances alleged in paragraphs 11 through 39, taken together, establish that Harvard denied Mr. Pugeda the rights protected by Mass. Gen. Laws ch. 93, § 103(a). Mass. Gen. Laws ch. 93, § 103(c).

72. As a direct and proximate result of Harvard's violation of the MERA, Mr. Pugeda has suffered the injuries set forth above, including the loss of the opportunity to compete for admission on equal terms, emotional distress, humiliation, and loss of dignity. He is entitled to compensatory and exemplary damages pursuant to Mass. Gen. Laws ch. 93, § 103(b), and to the costs of the litigation and reasonable attorneys' fees pursuant to Mass. Gen. Laws ch. 93, § 103(d).

## COUNT IV

### Discrimination in a Place of Public Accommodation (Mass. Gen. Laws ch. 272, § 98)

73. Plaintiff repeats and realleges the allegations of paragraphs 1 through 40 as if fully set forth herein.

74. Mass. Gen. Laws ch. 272, § 98 provides that "[w]hoever makes any distinction, discrimination or restriction on account of . . . deafness, blindness or any physical or mental disability . . . relative to the admission of any person to, or his treatment in any place of public accommodation, resort or amusement, as defined in section ninety-two A, . . . shall be liable to any person aggrieved thereby for such damages as are enumerated in section five of chapter one hundred and fifty-one B; provided, however, that such civil forfeiture shall be of an amount not less than three hundred dollars." The statute further provides: "All persons shall have the right to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, resort or amusement subject only to the conditions and limitations established by law and applicable to all persons. This right is recognized and declared to be a civil right."

75. A place of public accommodation includes "any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public." Mass. Gen. Laws ch. 272, § 92A. HMS, located at 25 Shattuck Street in Boston, solicits the patronage of the general public. It advertises its M.D. program publicly, accepts applications from any member of the public who meets its published eligibility criteria, and charges application fees. HMS's admission decisions are selective; its application process is not. HMS tells the public that it does "not pre-screen applications," that "[a]ll applicants who submit an AMCAS application and designate Harvard Medical School will receive our secondary application," that it "welcomes applications from non-traditional students," and that it seeks applicants "regardless of their undergraduate

institution." Every interviewing applicant receives its applicant services: the applicant portal, the Admissions Ambassador Directory and HMS's offer to "facilitate your connection" with students, interview-day programming, and the admissions interview itself. Every applicant enters that single process, and the interview stage, with its portal, Ambassador directory, and interview, is a stage of it, not a separate program.

76. Harvard made a distinction, discrimination, and restriction on account of Mr. Pugeda's deafness relative to his admission to, and his treatment in, that place of public accommodation, by the conduct set out above, including its categorical refusal to interpret the one-on-one Admissions Ambassador conversations available to other applicants and the hearing-loss question Dean Mayer put to him in his admissions interview. Harvard thereby denied him the full and equal advantages and privileges of HMS's applicant services. By its terms, Harvard's interpreter rule excluded Deaf applicants who use ASL from the live Ambassador conversations that, as alleged in paragraph 13, were available to every other interviewing applicant.

77. As a direct and proximate result, Mr. Pugeda has suffered the injuries set forth above, including emotional distress, humiliation, and loss of dignity, and is entitled to the damages enumerated in Mass. Gen. Laws ch. 151B, § 5, including a civil forfeiture of not less than three hundred dollars, and to punitive damages pursuant to Mass. Gen. Laws ch. 151B, § 9.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tyler Pugeda respectfully requests that this Court enter judgment in his favor and against Defendant, and award the following relief:

A. Compensatory damages under Section 504 of the Rehabilitation Act in an amount to be determined at trial, for the non-emotional injuries alleged herein;

B. Compensatory and exemplary damages under the Massachusetts Equal Rights Act, Mass. Gen. Laws ch. 93, § 103(b), in an amount to be determined at trial, including for emotional distress, humiliation, and loss of dignity;

C. Damages under Mass. Gen. Laws ch. 272, § 98, as enumerated in Mass. Gen. Laws ch. 151B, § 5, in an amount to be determined at trial, including a civil forfeiture of not less than three hundred dollars, and punitive damages pursuant to Mass. Gen. Laws ch. 151B, § 9;

D. Nominal damages to vindicate Plaintiff's protected rights;

E. A reasonable attorney's fee as part of the costs pursuant to 29 U.S.C. § 794a(b); and the costs of this litigation and reasonable attorneys' fees pursuant to Mass. Gen. Laws ch. 93, § 103(d);

F. The costs of this action pursuant to Fed. R. Civ. P. 54(d)(1);

G. Prejudgment interest pursuant to Mass. Gen. Laws ch. 231, § 6B and post-judgment interest pursuant to 28 U.S.C. § 1961; and

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable, including all claims for damages under Counts I through IV. *See* Fed. R. Civ. P. 38(b); U.S. Const. amend. VII.

Dated: November 1, 2026

Respectfully submitted,

TYLER PUGEDA,

By his attorneys,

/s/ Angie I. Martell
Angie I. Martell (BBO No. 556082)
IGLESIA MARTELL LAW FIRM, PLLC
2723 S. State Street, Suite 150
Ann Arbor, MI 48104
Telephone: (734) 369-2331
angie@iglesiamartell.com

Andrew Rozynski, Esq. (N.Y. Bar No. 5054465)
(pro hac vice application to be filed)
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, NY 10003
Telephone: (212) 353-8700
arozynski@eandblaw.com